## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI EASTERN DIVISION

| | |
|---|---|
| MARLA ALIECE SIMS-KING individually and as representative of a class of participants and beneficiaries on behalf of the Washington University Retirement Savings Plan, | Civil Action No. |
| *Plaintiff*, | |
| v. | |
| WASHINGTON UNIVERSITY IN ST. LOUIS, LORRAINE GOFFE-RUSH, LEGAIL CHANDLER, LINDA HACK, WASHINGTON UNIVERSITY IN ST. LOUIS BOARD OF TRUSTEES, and DOES 1-10, | |
| *Defendants*. | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Marla Aliece Sims-King individually and as representative of a class of participants and beneficiaries in the Washington University Retirement Savings Plan (the "Plan"), brings this action and files this Class Action Complaint ("Complaint") under 29 U.S.C. §1132(a)(2) on behalf of the Plan and its participants against Defendants Washington University in St. Louis ("Washington University"), Lorraine Goffe-Rush, Legail Chandler, and Linda Hack, and the Washington University in St. Louis Board of Trustees (collectively "Defendants"), seeking redress for their breaches of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA").

## INTRODUCTION

1.      Every year, millions of employees entrust their retirement savings to plans established under ERISA.  ERISA plans are protected by their fiduciaries that are obligated to act prudently and loyally to protect the participants.  Failures by ERISA fiduciaries have stark financial consequences for the participants.  Every extra point of expenses imposed upon participants and every underperforming investment option compounds over time, draining the value of participants' investments available upon retirement.

2.      The Plan is one of the largest §403(b) defined contribution retirement savings plans in the country with approximately 24,000 participants and $3.8 billion in assets.  The fiduciaries to the Plan (named as Defendants in this action) utterly abdicated their fiduciary duties to act prudently and loyally.  Instead, they turned the Plan over to the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA" or "TIAA-CREF") and Vanguard Group, Inc. ("Vanguard").  TIAA and Vanguard, in turn, poured the Plan's funds into scores of duplicative, expensive and underperforming TIAA and Vanguard propriety products.  By doing so, TIAA and Vanguard reaped multiple layers of fees, but the Plan and its participants lost the potential growth their investments could have achieved had the Defendants properly discharged their fiduciary duties.

3.      As a result of Defendants' breaches of their fiduciary duties, Plan participants were damaged because, among other things:

    a.  They paid higher recordkeeping fees than necessary, because Defendants agreed to permit TIAA and Vanguard to charge such fees based on a percentage of assets invested instead of based on the number of plan participants;

2

b. With respect to many funds, they paid the higher "retail" investment class fees paid by small investors even though, based on the size of the Plan, lower-fee class versions of the identical fund (with the same fund manager) were available of large investors like the Plan; and

c. They were burdened with an excessive number of duplicative funds, including poorly-performing funds, "bundled" into the Plan by TIAA and Vanguard mandates, which resulted in higher fees and/or poorer investment returns, thereby enriching TIAA and Vanguard at the expense of Plan participants.

4.     By this action, Plaintiff seeks, on behalf of all participants in the Plan, to enforce Defendants' personal liability under the Plan to restore losses caused by their breaches of fiduciary duty and to reform the Plan in a manner consistent with proper exercise of fiduciary duties.

5.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including but not limited to review of filings with the Department of Labor ("DOL"), other publicly available documents, documents provided to Plaintiff as a Plan participant, and other analytical investment data. As Plan fiduciaries, Defendants have possession of material information relating to the claims herein.  Even though ERISA requires plan fiduciaries to provide plan participants, upon request, certain relevant information including specific documents, as of the filing of this Complaint Defendants have failed to provide Plaintiff the specific documents she requested in writing over two months ago.  Upon receipt of all of the requested documents, Plaintiff reserves the right to amend this Complaint to incorporate, among other things, information contained in the requested documents.

## JURISDICTION AND VENUE

6.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under ERISA pursuant to 29 U.S.C. §1132(a)(2) and (3).

7.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District in which the Plan is administered, where at least one of the alleged breaches of fiduciary duty occurred, and where all Defendants are deemed to reside.

8.     Plaintiff has standing to bring this lawsuit on behalf of the Plan under §1132(a)(2). The Plan is the victim of a fiduciary breach and the recipient of any recovery. Section 1132(a)(2) authorizes any participant to sue as a representative of the Plan to seek relief on behalf of the Plan. An ERISA plan participant has standing to sue on behalf of the Plan and all Plan participants under Section 1132(a)(2) even where the participant is not invested in each and every investment offered within the Plan. As explained in detail below, the Plan suffered millions of dollars in losses and harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

9.     In addition, Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent investment options and/or excessive fees charged in the Plan because Defendants' inclusion of those options deprived participants, including Plaintiff, of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations.  The named Plaintiff and all participants in the Plan were financially harmed, *inter alia*, by Defendants' allowing TIAA and Vanguard to overcharge for recordkeeping services, to mandate the bundling and inclusion of expensive and underperforming TIAA and Vanguard products in the Plan, to include higher priced versions of investment options in the Plan and to offer far too many

4

investment options that were often inefficient and duplicative. Defendants' fiduciary duties instead required that each investment option be independently reviewed and selected for inclusion in the Plan based upon the prudence of the option. In turn, Defendants' breaches of fiduciary duties resulted in additional violations of ERISA because TIAA and Vanguard were permitted to engage in prohibited interested party transactions for their benefit and against the interests of the Plan and its participants.

10.     The Plan, Plaintiff, and other Plan participants, would not have suffered these losses if Defendants had not abdicated their duties.

## PARTIES

### Washington University Retirement Savings Plan

11.     The Washington University Retirement Savings Plan is a defined contribution, individual account 403(b) employee pension benefit plan under ERISA, 29 U.S.C. § 1002(2)(A) and § 1002(34).

12.     Under the Plan, all common law employees (including faculty and staff) of Washington University and their beneficiaries are eligible to enroll in the Plan. For many Washington University employees, the Plan provides the only source of retirement income and is the only vehicle by which they save and plan for retirement. The amount of income in Plan participants' accounts is based upon deferrals of employee compensation, employer matching contributions, and performance of investment options—net of fees and expenses.

13.     As of December 31, 2015, the Plan held more than $3.77 billion in assets and had nearly 24,000 participants with account balances. The Plan is among the largest of all defined contribution plans in the United States based on total assets and, Plans of such great size are commonly referred to as "jumbo plans."

**Plaintiff**

14.     Plaintiff Marla Aliece Sims-King resides in St. Louis County, Missouri, and is a former employee of Washington University.  She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

15.     Defendant Washington University is a private university organized under Missouri law with its principal place of business in St. Louis, Missouri. Washington University was created pursuant to an act of the General Assembly of the State of Missouri issuing a charter providing for seventeen (17) Trustees with perpetual succession.

16.     The Washington University in St. Louis Board of Trustees is the governing body of Washington University.

17.     Washington University is designated as the Plan Administrator pursuant to 29 U.S.C. § 1002(16)(A)(i) and is responsible for the management of the Plan. The Plan also designates Washington University as the "named fiduciary" under 29 U.S.C. § 1102(a)(2) with responsibility for the control or management of Plan assets.

18.     Washington University acts through the Board of Trustees and its executive leaders and administrators. Washington University, acting through the Vice Chancellor for Human Resources, has all discretionary authority and powers necessary to administer the Plan.

19.     Upon information and belief, Washington University delegated to the Vice Chancellor for Human Resources the authority to oversee the investment options provided under the Plan or otherwise administer the Plan, or to delegate these functions.

6

20.     Defendant Lorraine Goffe-Rush is a former employee of Washington University, and served in the Washington University Office of the Vice Chancellor for Human Resources from 2010-2015, including as Assistant Vice Chancellor for Human Resources from 2010-2013 and Vice Chancellor for Human Resources from 2013 until her departure from Washington University in February 2015.

21.     Defendant Legail Chandler is an employee of Defendant Washington University, and currently serves as Washington University's Vice Chancellor for Human Resources and bears overall responsibility for university-wide Human Resources. Upon information and belief, Defendant Chandler has served in this position at Washington University since February of 2015, upon succeeding past-Vice Chancellor for Human Resources Lorraine Goffe-Rush.

22.     Defendant Linda Hack serves as Washington University's Director of Benefits and Compensation. Upon information and belief, Defendant Hack has served in this position since November 2014.

23.     DOES 1 to 10 were or are, now, and/or at all times mentioned in this complaint, employed by Washington University during the Class Period (defined, *infra*) and were or are fiduciaries to the Plan. Plaintiff does not know the true names or capacities of DOES 1-10 and for that reason, DOES 1-10 are sued under such fictitious names. Plaintiff will seek leave of court to amend this Complaint to allege such names and capacities as soon as they are ascertained.

24.     Upon information and belief, Washington University, its Board of Trustees, Lorraine Goffe-Rush, Legail Chandler, Linda Hack, and DOES 1-10 were and are responsible for selecting and overseeing the investment options provided under the Plan and otherwise administering the Plan.

25.     Defendants are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plans, as described in more detail below. 29 U.S.C. §1002(21)(A)(i) and (iii).

26.     Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were in some manner legally responsible for the events, happenings and circumstances alleged in this Complaint. Defendants proximately caused the Plan, Plaintiff, and all others similarly situated to be subjected to the unlawful practices, wrongs, complaints, injuries, and/or damages alleged in this Complaint. Defendants, and each of them, are now, and/or at all times mentioned in this complaint were the agents, servants, and/or employees of some or all other Defendants, and vice-versa, and in doing the things alleged in this Complaint, Defendants are now and/or at all times mentioned in this Complaint were acting within the course and scope of that agency, servitude, and/or employment.

## DEFENDANTS ARE FIDUCIARIES UNDER ERISA

27.     ERISA extends fiduciary status to named fiduciaries and functional fiduciaries.   A person is a functional fiduciary to the extent that (1) he or she exercises control over the management of the plan, or any authority or control over plan assets; (2) he or she exercises discretionary authority or control over plan assets or (3) he or she renders investment advice for a fee or other compensation.

28.     ERISA, imposes strict fiduciary duties of loyalty and prudence upon the Defendants as Plan fiduciaries. Section 1104(a), provides:

(a) Prudent Man Standard of Care

(1)  . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

 (A) for the exclusive purpose of

  (i) providing benefits to participants and their beneficiaries; and

  (ii) defraying reasonable expenses of administering the plan; [and]

 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29. 29 U.S.C. § 1103(c)(1) provides that plan assets shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

30. ERISA fiduciaries exercising authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of others.

31. Fiduciaries must ensure that the amount of fees paid to service providers is reasonable.

32. ERISA's fiduciary duties are the highest known to the law and must be performed with an eye exclusively on the interests of participants. The Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers or upon an initial selection or approval of Plan investments. The duty to conduct an independent investigation into the merits of a particular investment is a basic aspect of Defendants' fiduciary duties under ERISA. Fiduciaries must use appropriate methods to investigate the merits of plan investments. Fiduciaries must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants. Fiduciaries also have a continuing duty to

monitor plan investments and remove imprudent ones. This duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments.

33.     Likewise, Defendants cannot abdicate their ongoing fiduciary duties to the Plan participants by including a very large number of investment alternatives in the Plan's investment options menu and then leave to the participants the responsibility for choosing among them.

34.     Furthermore, under ERISA selecting higher-cost investments that benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. Defendants cannot abdicate their ongoing fiduciary duties to conflicted decision-makers.

35.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered *per se* violations because they entail a high potential for abuse. 29 U.S.C. § 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *
>
> (C)  furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

36.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of another fiduciary:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

37.     Section 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## FACTUAL BACKGROUND

### A.     The Plan Is A Defined Contribution Plan

38.     A "defined-contribution" plan is a retirement plan in which the value of a participant's retirement accounts is determined solely by (and thus limited to) employee and employer contributions plus the amount gained through investment in the options made available in the plan (less expenses). Employees contribute a percentage of their pre-tax earnings to the plan through an individual account which is invested in investment options selected by determined by

the Plan's fiduciaries. In the Plan, Washington University matches employee contributions at the rate of 7%-11.5% depending on factors including date of hire and length of service.

42.     The majority of fees assessed to the Plan's participants are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses significantly reduce the value of an account in the Plan. The Plan fiduciaries control plan expenses, including those associated with the service providers selected and hired to administer the Plan (*e.g.*, recordkeepers). The Plan fiduciaries are also responsible for negotiating and approving fees paid to the Plan service providers, whether directly or indirectly paid. The Plan fiduciaries control the menu of investment options offered in the Plan. Selections each have their own fees, which are deducted from the returns that participants receive on their investments.

39.     The failure of the Plan fiduciaries to exercise control of the Plan investment menu and expense structure directly impacts the Plan participants. Investment returns and expenses have a compound effect on the gains of the retirement accounts. According to the DOL, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. Plan fiduciaries, thus, must engage in a rigorous process to control these costs and ensure that participants pay only reasonable fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly impacted and reduced, and participants' individual accounts lose dollars that would otherwise be invested and appreciate in value during their careers until retirement (and beyond). As such, Plan participants' financial pictures during retirement and the level of retirement income and security they will having during their retirement years is directly impacted by the decisions

and conduct of Plan fiduciaries in selecting investment options, monitoring investment performances, and negotiating (and reducing) plan fees.

40.     Service providers, like TIAA or Vanguard, have substantial economic interest to bundle as many of their proprietary products into the Plan as possible, and to structure their compensation to maximize their own interests. Defendants permitted TIAA and Vanguard for years to provide services, including recordkeeping services, on a bundled basis by which only TIAA and Vanguard investment products were included as options on the Plan investment menu, regardless of the prudence or performance of those investments options.  And, TIAA and Vanguard collected of fees relating not only to their recordkeeping in their investment products, but also for investment management of the underlying Plan options.

**B.     The TIAA and Vanguard Compensation Structure Promotes the Imposition of Harmful Fees on Plan Participants**

41.     TIAA and Vanguard have direct special interests to include actively managed propriety funds in the Plan investment menu. Investment options can be passively or actively managed. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds. Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio", stated in basis points (bps), where one basis point is equal to 1/100th of one percent (or 0.01%). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

42.     TIAA and Vanguard also have an interest in maximizing recordkeeping fees in higher cost investment classes. Many mutual funds offer investors different classes. Retail classes are marketed to individuals with small amounts to invest, and these classes are more expensive in terms of cost. Institutional classes bear lower costs and are offered to investors with large amounts

to invest, such as large retirement plans. Mutual fund companies have different names for intermediate classes (*e.g.*, Vanguard's Admiral shares, TIAA's Advisor shares). The different classes of a given mutual fund have the exact same manager and invest in the same portfolio of securities. The only difference between the classes is that the retail class charges significantly higher fees, resulting in retail class investors receiving lower returns over time. The different classes are otherwise identical in all material respects.

43.    For example, Vanguard's 500 Index Fund is available in four (4) different classes. Retail (which are referred to by Vanguard as "Investor" class and are, upon information and belief, Vanguard's version of retail class).  In this particular fund, the retail class (VFINX) has an expense ratio of 0.16%, or 16 bps. Another class is often available with Vanguard funds and is referred to as Admiral class. For this fund, the expense ratio for Admiral class (VFIAX) is 0.05% (5 bps), which is roughly 1/3 of the price of the retail class. Institutional class (VINIX) is less expensive and are offered at 1/4 the cost of retail, at 0.04% (4 bps), while Institutional Plus class (VIIIX) is less expensive, with an expense ratio of 0.02% (2 bps, and 1/8 of the cost of retail).

44.    TIAA and Vanguard receive and have received indirect compensation during the Class period, known as "revenue sharing." The fund pays a portion of its expense ratio for administrative and recordkeeping services. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. Revenue sharing provides an incentive for TIAA and Vanguard to recommend higher cost funds, including in-house, proprietary funds.

### C.    Modern Research Has Revealed Best Practices for ERISA Plan Fiduciaries

### 1.    High-Fee Actively-Managed Funds Perform Worse Than Less-Expensive Index Funds

45.     Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Funds with high fees on average perform worse than less expensive funds even on a pre-fee basis. An overwhelming body of evidence demonstrates that active asset managers hardly ever outperform passively managed index funds over the long term net of costs. For example, a commentator in 1998 noted that:  "The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in the S&P 500 Index fund." Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Axtive Quant., Active Portfolio Management*, at p. 37, 40, 53, (Frank J. Fabozzi ed. 1998).

46.     In 2005, Warren Buffet similarly concluded that "active investment management by professionals—in aggregate—would over a period of years underperform the returns achieved by rank amateurs who simply sat still" because "the massive fees levied by a variety of 'helpers' would leave their clients – again in aggregate – worse off than if amateurs of the invested in an unmanaged low-cost index fund." Mr. Buffet publicly offered to bet any willing investment professional $500,000 that they could not select a set of at least 5 hedge funds that could over a 10-year period beat (net of costs and expenses) outperform the Vanguard S&P 500 Index Fund. Only one investment professional took Mr. Buffet up on his bet, and the results were as expected. Over the first nine years (2008-2016), the Vanguard S&P 500 Index Fund gained 84% whereas the gain from the five actively-managed fund of funds were 2.9%, 7.5%, 8.7%, 28.3% and 62.% respectively, for an average of 21.88%.  As Mr. Buffet explained, very few individuals possess the capability of out-performing in the relevant index funds; indeed, he has only identified ten in his lifetime. *See* Mr. Buffet's February 2017 Annual Letter to Shareholders, available at http://www.berkshirehathaway.com/letters/2016ltr.pdf.

15

47.     The conclusion that active asset managers hardly ever outperform passively managed index funds over the long term net of costs has been confirmed in various studies and analyses. For example, a Vanguard research report published in March 2015, consistent with previous studies, observed that active fund managers as a group have underperformed their stated benchmarks across most of the fund categories and time periods Vanguard considered. *The Case for Index-Fund Investing*, Vanguard research (March 2015) at p. 4-5. Vanguard also concluded that funds invested in "inefficient" market segments "have not delivered on the promise of outperformance." (*Id*. at p. 8) Vanguard also observed that "[c]onsiderable evidence already exists that the odds of achieving a return that outperforms a majority of similar investors are increased if investors simply aim to seek the lowest possible cost for a given strategy." (*Id*. at p. 12) The Vanguard report noted that the average dollar-weighed expense ratio for actively-managed emerging markets funds was the highest of the investments studied. (*Id*. at p. 13.)

48.     Similarly, a June 5, 2017 report in the Wall Street Journal observed that the recent report by Standard & Poor's ("S&P") "adds impressive support to the large body of evidence suggesting the superiority of simple index investment strategies over traditional stock picking." *Index Fund Still Beat 'Active' Portfolio Management*, WSJ, June 5, 2017, by Burton G. Malkiel. The report observed:

> For years S&P has served as the de facto scorekeeper demonstrating the dismal record of "active" portfolio managers. During 2016, two-thirds of active managers of large-capitalization U.S. stocks underperformed the S&P 500 large-capital index. Nor were managers any better in the supposedly less efficient small-capitalization universe. Over 85% of small-cap managers underperformed the S&P Small-Cap Index.

> When S&P measured performance over a longer period, the results got worse. More than 90% of active managers underperformed their benchmark indexes over a 15-year period. Equity mutual funds do beat the market sometimes, but seldom can they do it consistently year over year.

The same findings have been documented in international markets. Since 2001, 89% of actively managed international funds had inferior performance. Even in less efficient emerging markets, index funds outperformed 90% of active funds. Indexing has proved its merit in various bond markets as well.

(*Id.*)

49.     In their paper *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds* and *Rethinking the Regulation of Securities Intermediaries*, Javier Gil-Bazo, Pablo Ruiz-Verdu and Jill E. Fisch, summarize studies showing that the most consistent predictor of a fund's return to investors is expense ratio. Their studies indicate that there is little evidence that higher fees are correlated with increased performance, and identify that brokers are incentivized to maximize compensation, not to offer the investor the best mutual fund option. Their papers illustrate that the funds that compensate brokers most highly are those that charge higher loads and 12b-1 fees, but, in turn, these higher fees reduce returns for investors.

50.     Indeed, a recent study by S&P Dow Jones Indices identified that over the 10-year investment horizon, 82.14 percent of large-cap managers, 87.61 percent of mid-cap managers, and 88.42 percent of small-cap managers failed to outperform their index benchmarks on a relative basis.

51.     Thus, the Plan fiduciaries must independently consider whether the added cost of actively managed funds is justified by an expectation of higher returns, as TIAA and Vanguard have special conflicting self-interests in actively managed funds.

### 2.     Fiduciaries of Large Plans, Like Washington University's, Can and Should Minimize Recordkeeping Costs

52.     Recordkeeping services are readily available to plans at highly competitive rates. In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper for specific services rendered. Payment for these services is typically paid as a flat dollar amount or deducted

as a percentage of plan assets. When utilizing a flat dollar amount, this number is routinely based on the number of participants within the Plan. Jumbo defined contribution plans like the Plan possess tremendous economies of scale for purposes of recordkeeping and administrative fees. For example, a plan with 30,000 participants can obtain a much lower fee on a per-participant basis than a plan with 3,000 participants. With direct payments, recordkeeper costs for providing services depends on the number of participants in the plan, not the amount of assets in a plan or in an individual account. Accordingly, a flat price based on the number of participants in a plan ensures that the amount of compensation is tied to the actual services provided and the cost of recordkeeping will not fluctuate or changes based upon, *e.g.* an increase in assets in the plan. Vanguard has even recognized this principle in a company white paper called *Shining a Light on ERISA Budget Accounts*:

> In the past, defined contribution (DC) plan sponsors and service providers typically treated revenue generated from the plan's assets as the primary method of payment for recordkeeping service fees. This recordkeeping revenue has grown over the years due to regular employer and employee contributions and market appreciation of plan assets.
>
> Plan sponsors and recordkeepers have worked together to ensure that the revenue-sharing amount received by the recordkeeper doesn't exceed the amount specified for the price of administrative services. This can be accomplished through a variety of arrangements, such as *adopting lower-priced share classes* (with a corresponding reduction in credits or revenue sharing for recordkeeping) or *transitioning from asset-based fees to flat, per-participant fees*. (emphasis added).

53.     TIAA and, until June 2016, Vanguard, were compensated for recordkeeping services as part of the indirect compensation structure based on asset management fees. Because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. Throughout the Class Period, Defendants have compensated the Plan's recordkeepers through

revenue sharing payments from the Plan's mutual funds, which has led to payment of excessive fees.

54.     Under DOL regulations that became effective January 1, 2009, certain employers with 403(b) plans became compelled to exercise greater control over their 403(b) plans than in the past. The regulations were expressly intended to make 403(b) plans more like 401(k) plans.

55.     Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan.

56.     The DOL separately published revised Form 5500 annual reporting rules (effective January 1, 2009) that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. These audited financial statements are to accompany the filing of Form 5500 and are publicly available through the DOL website. Notably, Defendants appear to have either failed to secure an audit of their financial statements for Plan year 2010, or omitted to submit the audit report with Form 5500 for that Plan year.

57.     Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations required them to engage in a comprehensive review of plan fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants.

### D.      Faithful Fiduciaries at Other Institutions Long Ago Initiated Reforms to Improve Plan Performance and Participant Options

#### 1.      The Loyola Marymount Example

58.     As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

59.     For example, in its 403(b) Retirement Plan Review Project Overview, the fiduciaries of the Loyola Marymount University ("LMU") 403(b) defined contribution plan recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party," and that "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services."

60.     To assist LMU in assessing the plan's investment options and recordkeeping services, beginning in 2008, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TIAA.

61.     LMU consolidated from two recordkeepers to one effective on the date the final DOL regulation became effective, January 1, 2009. Moreover, LMU selected Diversified as the new recordkeeper because Diversified did not require bundling investment products and that certain investment options be offered by LMU. LMU was therefore able to offer "best in class" funds in each fund category.

62.     Notably, LMU cited a number of reasons for why it did not select TIAA (and instead selected Diversified) as the recordkeeper, including but not limited to because:

- The annuity products offered by TIAA have not performed as well as the mutual funds offered by other service providers;

- Over the long run, selection of TIAA would result in higher fees paid by faculty and staff;

- TIAA offered less reliable administrative services; and

- TIAA received an unfavorable audit review.

63.     LMU also recognized that while the TIAA traditional fixed annuity has a favorable historical return rate, "the higher returns associated with TIAA traditional fixed annuity come at the expense of a severe lock-up period during which an investor who wants to transfer assets out of the account is currently required to move assets out gradually over a period of 10 years."

### 2.     The Pepperdine Example

64.     Pepperdine University followed suit in consolidating from four recordkeepers after determining that it must make certain changes to its retirement plan.

65.     Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper that does not offer proprietary investments, as the sole administrator and consolidated from four recordkeepers (Fidelity, TIAA, Vanguard and Prudential) to a single recordkeeper.

66.     Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. As identified by Paul Lasiter in his National Association of College and University Business Officers (NACUBO) publication entitled *Single Provider, Multiple Choices*, Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."

21

67.     Pepperdine also recognized that the bundled model (discussed, *infra*.) demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—whether or not those investments offered participants the best range of choice, value, and relative performance."

68.     Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."

### 3.     The Purdue Example

69.     In the fall of 2008, Purdue University began a comprehensive review of its defined contribution retirement program. According to James S. Almond in *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue recognized that "[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans*, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector."

70.     Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The

benefits of Purdue's program enhancements included the transition from five providers (TIAA, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated $3–4 million per year which is then compounded over time."

### 4.    The CalTech Example

71.    Likewise, as reported in an Institutional Investor article called *Caltech Names TIAA-CREF Recordkeeper*, the California Institute of Technology TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA and Fidelity) to a single recordkeeper (TIAA) effective January 1, 2010, with the assistance of an independent third-party consultant, Mercer Investment Consulting.

72.    In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the DOL, between 2013 and 2015, CalTech negotiated over $15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

### 5.    The Notre Dame Example

23

73.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."

74.     Hewitt noted several areas of plan improvements. First, recordkeeper consolidation provided "many benefits to participants," including cost savings, and Hewitt identified that "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."

75.     Second, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

## 6.     General Observations of Improving Conduct Among Plan Fiduciaries

76.     Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and

investment options, leading to enhanced outcomes and retirement security for their plans' participants.

77.     According to a 2013 survey of 403(b) plans (LIMRA Retirement Research, 403(b) Plan Sponsor Research), more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants.

78.     The majority of plans use a single recordkeeper because a multi-recordkeeper platform is inefficient and squanders the ability to leverage a plan's bargaining power.

79.     By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants while allowing participants to benefit from a more manageable number of institutional-quality investment options to choose from.

80.     Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

81.     AonHewitt's publication *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]"

82.     Peter Grant and Gary Kilpatrick of Towers Watson—another independent investment consultant—also recognized in *Higher Education's Response to a New Defined Contribution Environment* that using multiple recordkeepers makes it "difficult for employers to

25

monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness.

83.     The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees.

84.     For example, Kristen Heinzinger, in *Paring Down Providers: A 403(b) Sponsor's Experience*, identifies that

> One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.

85.     In *Single Provider, Multiple Choices*, Paul Lasiter notes, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors."

86.     Use of a single recordkeeper is simply less confusing to participants and eliminates excessive, overlapping recordkeeping fees.

**E.     Bundling of Products for the Recordkeeper's Benefit Redirects Plan Participant's Money and Growth Prospects to Self-Interested Vendors**

87.     Many service providers have marketed and offered "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. These plans are often marketed as "free" plans, meaning there are supposedly no additional fees beyond the revenues the provider receives from having their investment funds in the plan. In order to obtain the "free" pricing, the fiduciary must agree to put the provider's preferred investment lineup in the plan—a group of handpicked,

typically proprietary funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees.  In addition, the mandatory inclusion of proprietary products saddle a plan with multiple underperforming products that could have been substituted, by a faithful fiduciary, with a more focused menu of reasonably priced options.

88.     Thus, under these closed arrangements, funds are included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

89.     As identified by Peter Mooney, CEO of The Ancora Group's subsidiary Source Companies LLC, in an interview with Smart Business:

> When you use a bundled product, that plan is not owned by you, the employer. Instead, it is owned by the investment company, which negotiates each of the components and their fees, and then sells them bundled together.
>
> As a result, you are tied to whatever the investment company has negotiated. If you are not happy with some component of the plan, you must sell all the assets, move the entire plan to another investment company and then repurchase the assets. That also requires terminating the relationship with your third-party administrator and setting up a relationship with a new one.

90.     Furthermore, as noted by Carole Luckenbach, CEBS, in *Best Practices Into Your 403(b) Plan*, 403(b) plans entailing bundled services and products charge fees as a percentage of assets and generally "do not provide fee and revenue transparency."

91.     Unlike the bundling model, in an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products and the plan fiduciary is free to reject the recordkeeper's conflicted proprietary fund recommendations, can independently assess whether

another investment manager offers a superior product at a more attractive price, and can include these more prudent funds in the plan's investment lineup.

92.      Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price.

93.      As further identified by Luckenbach:

In contrast to a bundled plan, an *open investment architecture plan* allows the plan sponsor to hire a best-in-class recordkeeper/administrator that is independent from the menu of investment products (no requirement to offer proprietary investment products such as annuities or mutual funds). The goal of this approach is to provide participants access to the lowest cost investment options in a transparent environment. As a result, the investment lineup can be determined without restriction and offer the most competitive investment products that are better suited for participants

***

A better model for 403(b) plans would include an open architecture with a quality recordkeeper and best-in-class investment options. Fees for the recordkeeping/administration could be paid by an annual per-participant fee (versus the asset-based fee model). The recordkeeping/administrative fees would be charged equitably to all participants with fees tied to administrative services. The plan sponsor can solicit bids for recordkeeping/administrative services based on the strength of the vendor's capabilities and engage in a separate process to determine prudent investment options. The investment options can be selected by an independent investment advisor.

94.      Prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms due to the higher level transparency of this model.

**F.      Defendants Have Ignored Prudent and Loyal Practices Resulting in the Enrichment of Vendors at the Expense of Plan Participants**

95.     As a result of Defendants' actions, the Plan has failed to embrace the open architecture platform and instead engaged service providers offering services and investment products on an inefficient, overpriced, and imprudent bundled basis.

96.     TIAA provides and provided its 403(b) plan services exclusively on a bundled basis. If a plan wishes to offer the TIAA Traditional Annuity—a fixed annuity product—TIAA requires that the CREF Stock Account, Money Market Account, and  many other proprietary products also be included in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products.

97.     There is no shortage of high-quality, low-cost alternatives to TIAA's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost.

98.     In addition, for over 30 years, Vanguard and TIAA together have provided the investment menu and administrative services in exchange for indirect compensation. Thus, the Plan maintained two recordkeepers compensated based on the revenue sharing in the proprietary investments of TIAA and Vanguard and many overlapping and duplicative investment options.

99.     Defendants abdicated their ongoing duty to evaluate each of the proprietary TIAA and Vanguard investment options offered within the Plan and engage in a cost-benefit analysis to

determine whether the TIAA services and the proprietary investment products required by TIAA to be in the Plan were prudent.

100.     The lack of any material changes from the package over many years evidences a lack of independent due deliberation by the Plan fiduciaries. The abdication resulted in the determination of the package by conflicted service providers.

## DEFENDANTS ABDICATED THEIR FIDUCIARY DUTIES AND VIOLATED THE STATUTE

**A.     The Bundled Plan Approach Violates Defendants' Fiduciary Obligations**

101.     The Plan used TIAA and Vanguard as a duo of service providers to administrate the Plan from at least 2009 until June 2016.  TIAA has provided and continues to provide investment options and services on a bundled basis. The investment fees and administration fees paid to TIAA are based as a percentage of on assets under management. TIAA's bundling requirements mandate the inclusion of TIAA proprietary investment products and TIAA recordkeeping.

102.     Vanguard is a mutual fund company the exclusively offers its proprietary products on an asset based fee basis.

103.     Since at least 2009, the Plans package of services and investment options has included the bundled TIAA propriety products and services and the Vanguard propriety products and services.

104.     Since at least 2009 and during the Class Period, Defendants provided between 100 and 120 different mutual funds or insurance company annuity products from TIAA and Vanguard, many of which entailed higher-cost share classes of mutual funds despite the Plan's tremendous size and bargaining power to demand low-cost investments.

105.    This Plan investment menu consisted (and continues to consist) exclusively of proprietary Vanguard and TIAA products.  Further, TIAA products are required to be offered in the Plan and cannot be removed without penalty to the Plan and its participants.

106.    During the Class Period, Defendants included bundled investment products, offered by the Plan's recordkeepers in the Plan for which lower-cost share classes, identical in every respect except for lower fees, had been available for years prior, in some cases going back a decade or longer. Plan participants could and should have been paying far less for the same investments since that time. As a result, Plan participants lost millions of dollars in the earnings their retirement assets would otherwise have made.

### 1.    The Inclusion of Expensive Products Bundled by Recordkeepers TIAA and Vanguard in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest

107.    During the Class period and until June 2016, the Plan maintained both TIAA and Vanguard as recordkeepers to provide administrative and recordkeeping services, instead of a single recordkeeper. This resulted in excessive recordkeeping and investment fees.

108.    Despite Defendants' substitution of lower-priced classes for a few funds between 2009 and 2016, during the Class period, Defendants continued to include many funds in higher-priced classes, when identical less expensive classes were available, or could have been available by leveraging the "jumbo" size of the Plan. Defendants also continued to include a grossly excessive number of investment options and excessively high-priced investment options in the Plan and allowed excessive recordkeeping fees to be assessed against Plan participants year after year, even though, as reflected by their substitution of lower-priced classes for a few funds, Defendants were aware that their fiduciary duties prohibited them from unnecessarily maintaining higher-priced classes.

31

109. As of the most recent Form 5500 filed with the DOL on July 29, 2016 for the Plan year ended December 31, 2015, Defendants included 119 investment options in the Plan which held the Plan's $3.77 billion in net assets. Among the available investments, 36 were TIAA options holding $2.74 billion in Plan assets and 83 were Vanguard options holding $1.03 billion. The 119 options included mostly retail class mutual funds, some (*i.e.* a few) intermediary share class mutual funds, insurance separate accounts, variable annuity options, and fixed annuity options. The retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional and other less expensive share classes (*i.e.* Vanguard's Admiral, Institutional, and Institutional Plus share classes), except that the retail class shares have much higher fees.

110. Likewise:

- in Plan year 2014, there were 119 investment options in the Plan holding the Plan's approximately $3.73 billion in assets, of which options 36 were TIAA products and 83 were Vanguard mutual funds;

- in Plan year 2013, there were 120 investment options in the Plan holding the Plan's approximately $3.51 billion in assets, of which options 36 were TIAA products and 84 were Vanguard mutual funds;

- in Plan year 2012, there were 120 investment options in the Plan holding the Plan's approximately $3.02 billion in assets, of which options 36 were TIAA products and 84 were Vanguard mutual funds;

- in Plan year 2011, there were 121 investment options in the Plan holding the Plan's approximately $2.73 billion in assets, of which options 36 were TIAA products and 85 were Vanguard mutual funds;

- in Plan year 2010, there were 119 investment options in the Plan holding the Plan's approximately $2.7 billion in assets, of which options 35 were TIAA products and 84 were Vanguard mutual funds; and

- in Plan year 2009, there were 117 investment options in the Plan holding the Plan's approximately $2.43 billion in assets, of which options 35 were TIAA products and 82 were Vanguard mutual funds.

111.    In each of these Plan years, the Plan offered many of the most expensive share class levels of Vanguard mutual funds.

112.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent upon the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan.

113.    The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

114.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. An insurance company separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

115.    The remaining TIAA funds are mutual funds. The TIAA mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. While the Plan has offered institutional class shares of TIAA mutual funds since 2011, many of these funds overlap with Vanguard funds offered in the Plan that either performed just as well (if not better) than the TIAA mutual funds, and/or were significantly less expensive than the TIAA investment options.

33

Moreover, the TIAA mutual funds typically hold bundles of other TIAA investment products, further enhancing TIAA's interest in the fee waterfall.

116.    The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the type of investment and share class.

117.    On June 7, 2016 Defendants consolidated the Plan's recordkeeping and administrative services with a single recordkeeper: TIAA.

118.    At the time Defendants consolidated to a sole recordkeeper in June 2016, Defendants also reduced slightly the Plan's investment options. The Plan still offers eighty-nine (89) investment options, including twelve (12) TIAA Lifecycle Target Date Retirement funds and twelve (12) duplicative Vanguard Target Retirement Funds; eighteen (18) actively managed TIAA proprietary funds—including the CREF Stock Account, the TIAA Real Estate Account—and twelve (12) actively managed Vanguard mutual funds, many of which covering overlapping asset classes; six (6) TIAA index funds and twenty seven (27) Vanguard index funds; and two (2) guaranteed income options, namely the TIAA Traditional Annuity Retirement Annuity and Group Retirement Annuity.

119.    Furthermore, the Plan continues to offer bundled and proprietary investments of the recordkeeper, TIAA, and Vanguard, numerous investments in overlapping or duplicative investment styles and asset classes, and on a bundled services/products arrangement, all resulting in excessive and unnecessary fees to the Plan, and to the great financial detriment of Plan participants. Defendants continue to utilize the bundled services and products of TIAA, and to include proprietary, underperforming investment options.

120.     TIAA offers its products and services strictly on a bundled basis. TIAA acknowledges this its own literature:

> TIAA-CREF is a "bundled" service provider, meaning that many of the services needed to support retirement plans, such as investment management, recordkeeping, administration and participant communications, are provided through a single service provider, namely TIAA-CREF.

121.     If a plan offers the TIAA Traditional Annuity, TIAA requires that the plan also offer its flagship CREF Stock Account and Money Market Account, and to use TIAA as recordkeeper for its proprietary products.

122.     TIAA's bundle included the same 35 or 36 TIAA proprietary products in the Plan year after year (including from Plan year 2009 forward).  Even following the Plan's mid-2016 changes, the Plan still permits TIAA to bundle its services and to require its products to be included as investment options within the Plan.

123.     The Plan includes TIAA's proprietary variable annuity funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which include four layers of expenses.

124.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following as of December 31, 2016:

a.     "investment management expenses" charge (ranging from 2.5 to 15 bps depending upon the variable annuity product);

b.     "administrative expense" charge (between 16.5 and 39.5 bps, depending on the "Class" of a given variable annuity product);

c.     "distribution expenses (12b-1)" charge (between 6 and 16.5 bps); and

d.     "mortality and expense risk" charge (0.5 bps).

125.    Two of the four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA to the Plan's participants, and the other two layers of fees pay for services that provide *no* benefit to the Plan's participants.

126.    The administrative fee is for recordkeeping and is charged as a percentage of assets, as a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA likewise increased and continues to increase even though the services provided did not increase at the same rate, resulting in further unreasonable compensation. Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, marketing and distribution services provide no benefit to Plan participants and are wholly unnecessary. Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, participants do not choose whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant who elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. All participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

127.    In addition, TIAA has not instituted any breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. As a

result, the Plan, with billions of dollars invested in CREF variable annuities, pays the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA and excessive fees paid by Washington University's employees and retirees in the Plan. The Plan subsidized these efforts for years, often at a loss—compounding their conflict and breaching their duty to participants under ERISA. The excessiveness of the investment management fee is even more unjustified because of the way critics—such as Funding Universe in *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*—have documented how CREF "manages" the CREF Stock Account by merely investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index.

128.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses alleged above, and adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2016, TIAA Real Estate expense charges consisted of the following:

      a.     "investment management" charge (32 bps).

      b.     "administrative expense" charge (26.5 bps);

      c.     "distribution" charge (12.5 bps);

      d.     "mortality and expense risk" charge (0.5 bps); and

      e.     "liquidity guarantee" (17 bps).

129.    The 17 bps "liquidity guarantee" expense of the TIAA Real Estate Account is explained by TIAA as simply for "enabling the Account to have funds available to meet participant redemption, transfer of or cash withdrawal request," which TIAA acknowledges is a no-value-added "service" because "[t]his guarantee is required by the [New York Department of Financial

Services].” This fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index Institutional (VGSNX), which has a total expense ratio of 10 bps as of February 8, 2017, compared to the TIAA Real Estate Account's total expense ratio of 88.5 bps.

130.    Furthermore, the TIAA mutual funds offered in the Plan – although they appear to have been offered in the institutional share class from 2011 forward – and other TIAA products charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

131.    Plan participants are paying for marketing costs of funds that their employer has placed in the Plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plan do not include such marketing costs.

132.    Many of the TIAA mutual funds offered as investment options in the Plan during the Class Period, even though offered as institutional shares (for Plan year 2011 forward), were often still far more expensive than comparable investment products, including comparable Vanguard mutual funds that were already offered in the Plan.  For example, as of the end of Plan year 2015, the Plan offered the TIAA-CREF Small-Cap Equity fund (institutional shares) (TISEX), in which $26.6 million of the Plan's assets were invested. This fund had an expense ratio of 42 bps as of December 31, 2016, whereas Vanguard's product that tracks the same index that serves as the benchmark for TISEX (*i.e.* the Russell 2000), namely the Vanguard Russell 2000 Index fund (institutional shares) (VRTIX), has been available since December 22, 2010 and has an expense ratio of 8 bps (as of December 22, 2016) – more than 1/5 of the cost of the TIAA-CREF Small-Cap Equity fund. This is the case with many of the TIAA mutual funds offered in the Plan.

133.     Also, in many cases, the TIAA mutual funds offered by the Plan invest in other or underlying TIAA mutual funds, creating multiple levels or tiers of fees for TIAA.

134.     The Vanguard mutual funds that have been available as investment options in the Plan going back to at least 2009 have been offered predominantly in higher-prices share classes when reduced-price Admiral, Institutional, or Institutional Plus shares of these Vanguard funds were available (and have been, in some cases for a decade or longer).

135.     Until June 2016, the Plan's package included both TIAA and Vanguard as recordkeepers. Neither TIAA nor Vanguard was directly compensated for recordkeeping based on the number of Plan participants. Both were indirectly compensated for recordkeeping based on invested assets.  Rather than obtaining pricing based on a 20,000+ participant plan from one recordkeeper, Defendants spread recordkeeping of participants among two recordkeepers – TIAA and Vanguard – who required inclusion of their own proprietary products, pushed each of their own products on the Plan, and who pushed each other's products. The latter statement is made clear by the fact that TIAA and Vanguard products are routinely offered together inside of 403(b) plans. Effective June 7, 2016, Defendants retained TIAA as the single recordkeeper to the Plan.

136.     This inefficient and costly structure maintained by Defendants, coupled with the bundled services provided by the Plan's service providers, has caused Plan participants to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services.

137.     Even after the restructuring in mid-2016, the Plan continues to pay excessive fees for recordkeeping and administrative services.

138.     Prior to the mid-2016 Plan restructuring, Vanguard was also compensated for recordkeeping services based on revenue sharing payments from their proprietary Vanguard

mutual funds, including from the dozens of higher-cost retail share classes of those Vanguard funds that Defendants included in the Plan instead of available lower-cost (*e.g.* institutional class) shares.

139.   Upon information and belief, Vanguard is still compensated for custodial services and receives revenue sharing for the proprietary Vanguard mutual funds that are offered in the Plan.

140.   Also, the 2016 Plan and Investment Notice published on the Washington University website includes disclosures by TIAA of fees that deviate from the disclosed fees in the underlying prospectuses for the funds.  These discrepancies are, in several instances, beyond the point of a possible rounding error.  The deviations in expense reporting raise two possibilities: (1) TIAA is a reckless recordkeeper and Defendants permit this conduct without correction or rebuke; or (2) TIAA is adding additional points of fees for its own account and Defendants permit this conduct without correction or rebuke.  Either scenario is a blatant violation of Defendants' fiduciary duties.

2. **Inclusion of Higher Cost Investment Classes in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest**

141.   During the Class Period, lower-cost share classes of mutual fund investment options were available to the Plan. Although institutional share classes – including for Vanguard – sometimes have a minimum investment threshold to qualify for the institutional rate, mutual fund companies often waive these investment minimums for "jumbo" retirement plans, and it is common for investment advisors representing large retirement plans to seek waivers of investment minimums for access to institutional share classes of mutual funds. In fact, Vanguard, for example, expressly states in its SEC filings that it reserves the right to establish higher or lower minimum amounts for certain investors, including when the plan sponsor's aggregate assets within the Vanguard funds will likely generate substantial economies in the servicing of their accounts.

40

142.    Fiduciaries of other defined contribution plans have successfully negotiated less expensive institutional share classes of Vanguard and TIAA mutual funds on behalf of their plans despite not meeting the minimum investment thresholds.  Moreover, the wide spread of the Plan across duplicative investments inherently lessens the Plan's opportunities to leverage its enormous size by focusing on a reasonable number of investment options and minimizing costs within that group.

143.    Therefore, Defendants knew or should have known that investment providers would have allowed the Plan to provide lower-cost share classes to participants if Defendants had asked, and that these arrangements could be negotiated and obtained.

144.    A number of TIAA mutual funds were included in the Plan during Plan years 2009 and 2010 for which a significantly lower-cost, but otherwise identical, share class of the same TIAA mutual fund was available. Each of the TIAA-CREF Lifecycle target retirement funds were offered during these Plan years as retirement class shares when institutional shares were available. For example, the TIAA-CREF Lifecycle 2025 (Retirement) fund (TCLFX) was offered when identical institutional shares (TCYIX) were available. Current expense ratios for these share classes of this fund are 66 bps and 41 bps, respectively, reflecting a cost excess for the retirement shares of nearly 61%.  As another example, the TIAA-CREF Large Cap Value Index (Retirement) fund (TRCVX) was offered for those two years, whereas institutional shares were also available (TILVX). Current expense ratios for these share classes of this fund are 31 bps and 6 bps, respectively, reflecting a cost excess for the retirement shares of nearly 417%.

145.    Higher fees resulting from expensive share classes have been assessed to the Plan with respect to the Vanguard mutual fund offerings from at least 2009, forward. For example, more expensive investor shares of the Vanguard 500 Index fund (VFINX) have been offered for years

41

when admiral shares (VFIAX), institutional shares (VINIX), and institutional "plus" (VIIIX) shares have all been available during the Class Period. In 2012, the expense ratio for investor shares was 17 bps, whereas admiral shares were 5 bps, institutional shares were 4 bps, and institutional "plus" shares were 2 bps, reflecting an excess cost of 240%, 325%, and 750% respectively. As another example, more expensive investor shares of the Vanguard Total Stock Market Index fund (VTSMX) were offered in the Plan whereas admiral shares (VTSAX), institutional shares (VITSX), and institutional "plus" shares (VSMPX) were available during the Class Period.  In 2012, for example, investor shares had an expense ratio of 17 bps, whereas admiral shares were 5 bps, institutional shares were 4 bps, and institutional "plus" shares were 2 bps, reflecting an excess cost of 240%, 325%, and 750% respectively. For at least the duration of the Class Period, this was the practice of the Plan, and excessive fees resulting from offering more expensive share classes of Vanguard mutual funds were charged for Vanguard offerings in the Plan.

146.    Lower-cost share classes of the identical mutual funds have been available for years, with a number of them dating back to the early 2000s and before.

147.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the available lower-cost share class mutual fund options, the Plan and its participants would not have lost millions of dollars of their retirement savings due to wholly unnecessary fees.

148.    A hypothetical example illustrates just how harmful fees are to the growth of an investment over time, even if they appear to be small at the moment.  Assume a $1,000 investment with 8% growth compounded quarterly over 30 years.  With no management fees, that investment will be worth $10,765.16 (Case 1) at the end of the term.  With a 0.1% quarterly management fee,

42

that investment will be worth $9,569.78 after 30 years (Case 2).   With a 0.2% quarterly management fee, that investment will be worth $8,506.16 after 30 years (Case 3).   And, with a 0.417% (or 417% higher than 0.1%) quarterly management fee, that investment will be worth just $6,584.52 after 30 years (Case 4).   The chart below demonstrates the effect of excessive fees and why this is such an important issue of fiduciary oversight:



### 3.   Inclusion of Excessive, Expensive and Duplicative Investment Options in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest

149.   During the Class Period, the Plan included numerous duplicative funds in the same investment style and across overlapping asset classes, thus depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees.

150.   Defendants included over 100 investment options in the Plan, many of which overlapped for numerous asset classes, including: target date (2 families) and asset allocation

funds, large-cap domestic equities, mid-cap domestic equities, small-cap domestic equities, international equities, real estate, fixed income, bonds funds, and money market.

151.    For a Plan participant to review the prospectuses of the nearly 120 investment options that were in the Plan prior to mid-2016, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the 100-plus funds they selected and retained for the Plan.

152.    Despite the Plan changes in mid-2016, there remain 89 investment options on the Plan's menu. The duplicative investment styles and overlapping asset classes within the Plan thus remains.

153.    In comparison to the more than 100 options in the Washington University Plan, according to Callan Investments Institute's *2015 Defined Contribution Trends* survey, defined contribution plans in 2014 had, on average, 15 investment options, excluding target date funds. This manageable and limited number of investment options provides participants with a choice of investment styles while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and obtaining lower fees. It also reflects an evaluation process designed to select the "best in class" investment choice in a particular investment style.

154.    A larger pool of assets in each investment style significantly reduces fees paid by participants. Had the Plan consolidated duplicative investments of the same investment style into a single investment option, the Plan would have had the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

44

155.    Including a large number of alternatives—as Defendants have done for years and continue to do despite the June 2016 Plan modification—removed the benefit of pooling assets consistent with the size of the Plan a lineup of nearly 120 options (and now still nearly 90), many of which are duplicative and all of which were proprietary to the Plan's recordkeepers—benefits the conflicted service providers at the expense of the Plan participants.

156.    Moreover, having many actively managed funds in the Plan within the same investment style resulted in the Plan effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

157.    During the Class Period, the Plan included duplicative investments in nearly every major asset class and investment style, including balanced/asset allocation, fixed income and high yield bond, international, large cap domestic equities, mid cap domestic equities, small cap domestic equities, real estate, bond, money market, and target date investments (2 fund families).

158.    For illustration purposes, in the large cap blend investment style for the Plan, Defendants included twelve actively managed or passively managed investment options for a combined asset amount of approximately $928.5 million as of December 31, 2015. Those investments are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.[1]

---

[1] Expense ratios for TIAA variable annuity products reflect the expense ratios identified in the most recent available prospectuses for these products (*i.e.* May 1, 2016). Expense ratios for TIAA mutual fund products reflect the expense ratios identified in the most recent available prospectuses for these products (*i.e.* December 31, 2016). The expense ratios for Vanguard mutual funds reflect the expense ratio for 2015, as tracked by Morningstar, Inc. Because Defendants' Forms 5500 fail to specify what Class of variable annuities are offered in the Plan, Plaintiff provides, by way of example, an expense ratio for Class R2. Plaintiff reserve the right to amend or revise this information during or following discovery.

| Investment | 2015 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| CREF Equity Index | $57,883,749 | 36.5 bps | 2 bps | 1725% |
| CREF Stock | $632,643,451 | 38 bps | 2 bps | 1800% |
| TIAA-CREF Large-Cap Growth Index (Inst) | $11,765,275 | 6 bps | 2 bps | 200% |
| TIAA-CREF Large-Cap Value (Inst) | $31,726,023 | 42 bps | 2 bps | 2000% |
| TIAA-CREF Large-Cap Value Index (Inst) | $28,679,518 | 6 bps | 2 bps | 200% |
| TIAA-CREF S&P 500 Index (Inst) | $19,380,666 | 6 bps | 2 bps | 200% |
| Vanguard 500 Index Fund (Adm) (VFIAX) | $74,376,077 | 5 bps | 2 bps | 150% |
| Vanguard Dividend Appreciation Index Fund (Inv) (VDAIX) | $1,102,344 | 20 bps | 2 bps | 900% |
| Vanguard Growth & Income Fund (Inv) (VQNPX) | $12,489,539 | 34 bps | 2 bps | 1600% |
| Vanguard Large-Cap Index Fund (Inv) (VLACX) | $2,465,665 | 20 bps | 2 bps | 900% |
| Vanguard PRIMECAP Core Fund (Inv) (VPCCX) | $4,143,756 | 47 bps | 2 bps | 2250% |
| Vanguard Total Stock Market Index Fund (Adm) (VTSAX) | $51,801,752 | 5 bps | 2 bps | 150% |
| **TOTAL ASSETS** | **$928,457,815** | | | |

159.    With over $690 million held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were 18 and 19 times more expensive than the lower-cost Vanguard option (VIIIX) with an expense ratio of 2 bps.

160.    Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), Plan participants would have avoided losing millions in excess fees during the Class Period.

161.    Consolidation of the large cap blend options into one or two less expensive index funds was not possible because the TIAA funds that were bundled and required to be included in the Plan in conjunction with its provision of services.

162.    In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style.

163.    In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index such as the S&P 500 index, by holding a representative sample of securities in the index. Because no stock selection or research is needed, index fund fees are much lower than the fees of actively-managed funds in the same investment style.

164.    Including multiple similar index funds in the same investment style hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic indices would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

165.    Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plan would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

166.    The Plan's package retained investment options despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

167.    The only beneficiaries of Defendants' decision to include so many expensive and duplicative funds were TIAA and Vanguard, and not plan participants and beneficiaries.

>    **4.    The Inclusion of Certain TIAA Products in the Plan is Demonstrative of Defendants' Fiduciary Violations Under ERISA**

168.    Three funds in particular demonstrate the severe harm to the Plan resulting from Defendants' breaches of fiduciary duties: the TIAA Traditional Annuity, the CREF Stock Account and TIAA Real Estate Account.

169.    Each of these options is offered at the requirement of TIAA's bundling scheme. However, the acceptance of that scheme and the required products is inconsistent with faithful discharge of fiduciary duty.

>    **a.    Inclusion of the Punitive TIAA Traditional Annuity in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest**

170.    The Plan includes the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. The TIAA Traditional Annuity imposes onerous penalties on a participant that choses to withdraw from the investment.

171.    An example of the restrictions and penalties for withdrawal imposed by this Annuity include a punitive 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without this 2.5% penalty can only do so by spreading their withdrawal over a ten-year period.

>    **b.    Inclusion of the Expensive and Underperforming CREF Stock Account in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest**

48

172.     The CREF Stock Account is one of the largest investment options, by asset size, in the Plan with over $632 million in assets as of December 31, 2015, and has been included in the Plan during at least the Class Period. In its fund fact sheets and participant disclosures, TIAA classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has, for years, historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

173.     TIAA required that the CREF Stock Account, for example, be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account, to drive very substantial amounts of revenue sharing payments to TIAA for recordkeeping services.

174.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. According to William F. Sharpe in *The Arithmetic of Active Management*, "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

175.     Eugene F. Fama and Kenneth R. French identified in *Luck Versus Skill in the Cross-Section of Mutual Fund Returns* that "After costs . . . in terms of net returns to investors, active investment must be a negative sum game." To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses.

176.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future.

177.     However, the worst- performing mutual funds show a strong, persistent tendency to continue their poor performance.

178.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

179.     Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors. In *Returns from Investing in Equity Mutual Funds 1971 to 1991*, Burton G. Malkiel noted:

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, *a fortiori*.

180.     Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index. In *The Active Versus Passive Debate: Perspectives of an Active Quant*, Robert C. Jones noted:

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks ... The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe] ... The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
> ****
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

181.    In addition, the expense ratio that the CREF Stock Account charges is comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA to the Plan's participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan invested over $632 million in the CREF Stock Account.

182.    Had Defendants engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. In fact, it did not.

183.    Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. Defendants and TIAA identify the Russell 3000 index as the appropriate benchmark to evaluate that fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and to two other passively managed index funds in the same investment style, for the past six years. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Plus) (VITPX) and the Vanguard Institutional Index (Inst Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.

184.    From July 31, 2010 to July 31, 2016, the CREF Stock Account vastly underperformed these alternatives and benchmarks.  The CREF Stock Account returned an annualized growth rate of 10.76%.  In contrast, VIIIX returned 14.40%; VITXP returned 14.37%; and the Russell 3000 index returned 13.5%.  $1 million investment in the CREF Stock Account

R3 would have been worth $1,845,911 six years later. An investment in the Vanguard Institutional Index Institutional Plus Fund would have been worth $2,241,371. An investment in the Vanguard Institutional Total Stock Market Index Institutional Plus Fund would have been worth $2,237,782. The Russell 3000 Growth Index would have been worth $2,138,187. Overall, the CREF Stock Account underperformed by approximately 19%. On a $1 billion investment, the underperformance amounted to almost $200 million dollars in losses to retirement savings.

185.    TIAA even identifies in its own literature regarding the CREF Stock Account that this account has historically underperformed the CREF Composite Benchmark, the Russell 3000 Index, and the Morningstar Large Blend Average:

| Performance | | | | | | |
|---|---|---|---|---|---|---|
| | **Total Return** | | **Average Annual Total Return**[3] | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years |
| CREF Stock Account | 2.08% | 9.17% | 9.17% | 4.83% | 11.55% | 5.03% |
| CREF Composite Benchmark | 2.49% | 10.25% | 10.25% | 5.44% | 11.86% | 5.25% |
| Russell 3000 Index | 4.21% | 12.74% | 12.74% | 8.43% | 14.67% | 7.07% |
| Morningstar Large Blend Average | 3.86% | 10.37% | 10.37% | 6.80% | 13.18% | 6.07% |

186.    The CREF Stock Account was and is dramatically more expensive than two far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

187.    Apart from underperforming passively managed index funds, the CREF Stock Account also significantly underperforms comparable actively managed large cap alternatives with similar underlying asset allocations, including the Vanguard PRIMECAP (Admiral) (VPMAX) and the Vanguard Capital Opportunity (Admiral) (VHCAX).



188.    Despite the consistent underperformance, the CREF Stock Account is more expensive than better-performing actively managed alternatives, namely VPMAX and VHCAX.

189.    In addition to the abysmal long-term underperformance of the CREF Stock Account compared to these and other index funds and actively managed funds, the fund was recognized as imprudent in the industry.

190.    In March 2012, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan, specifically stating "We recommend termination of client investments in this product." This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time.

191.     Nevertheless, Defendants still retain the CREF Stock Account despite the fact that it continues to underperform lower-cost investment alternatives that were readily available to the Plans and even after the Plan changes in mid-2016.

192.     Had Defendants removed the CREF Stock Account years ago and had the amounts been invested in passively managed lower-cost alternatives or actively managed lower-cost alternatives years ago, Plan participants would not have lost potential growth in their retirement savings. However, Defendants could not and cannot remove the CREF Stock Account because it was and is required to be included in the Plan by TIAA in connection with TIAA's provision of services to the Plan.

**c.     Inclusion of the Expensive and Underperforming TIAA Real Estate Account in the Plan Violates Fiduciary Duties Under ERISA and Constitutes a Prohibited Transaction with Parties in Interest**

193.     The Plan includes three real estate investment options: TIAA Real Estate Account, the TIAA-CREF Real Estate Securities Fund (Inst), and the Vanguard REIT Index (Inv) (VGSNX). The TIAA Real Estate Account is one of the largest investment options, by asset size, in the Plan with over $103.5 million in assets as of December 31, 2015, and has been an option in the Plan for the Class Period and many years prior.

194.     The TIAA Real Estate Account has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index Fund (which is also offered in the Plan) in investor shares nonetheless rather than in significantly cheaper institutional shares.

195.     Additionally, the TIAA Real Estate Account charges five layers of fees that are each unreasonable compared to the actual services provided by TIAA to the Plan's participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the

54

services provided and given that the Plan invested over $100 million in the TIAA Real Estate Account.

196.    With an expense ratio of 88.5 bps, the TIAA Real Estate Account is also over 10 times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of 10 bps.

197.    The TIAA Real Estate Account has a decades-long history of substantial underperformance relative to the Vanguard REIT Index. Despite this, Defendants selected and to date retain it in the Plan.







198.    Had Defendants engaged in these types of prudent processes, the result of that analysis would have revealed that the costs to participants of continuing to pay ten times more to invest in the underperforming TIAA Real Estate Account far outweighed any continuing benefit of retaining it in the Plan. The analysis would have shown that an option already in the Plan was a clearly superior real estate alternative—the Vanguard REIT Index (Inst). The analysis would have also shown that the participants would have benefitted from Defendants consolidating the Plan's real estate options by eliminating TIAA Real Estate and moving those assets to the better-performing and much lower-cost Vanguard REIT Index (Inst).

199.    Defendants failed to conduct such an analysis and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

200.    Had the amounts invested in the TIAA Real Estate Account instead been invested in the far lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost millions of dollars of their retirement savings.

**B.      Defendants' Refusal to Comply with Plaintiff's Information Request is Symptomatic of Fiduciary Failure**

201.    On April 20, 2017, Plaintiff made a formal request (with an in-advance agreement to pay reasonable costs of copying and providing responsive documents) to the Plan Administrator for additional information from the Plan including: the current bargaining agreement, trust agreement, contract or any other instruments under which that plan is established and operated; any updates to or newer versions of the summary of the Plan and annual reports beyond those currently publicly available; any periodic actuarial reports, financial reports and audited financial statements to extent they exist and are not available publicly.  Plaintiff did not receive a substantive production responsive to her inquiry and has since reissued her request.

202.     The Plan's failure to provide, as of the filing of this Complaint (over two months after Plaintiff's request), a substantive documentary response to Plaintiff's request for additional information regarding the Plan and its operation is symptomatic the Defendants' systematic failure to fulfill their fiduciary duties to the Plan and its participants.

## CLASS ACTION ALLEGATIONS

203.     Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

204.     Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class (the "Class"):

> All participants in and beneficiaries of the Washington University Retirement Savings Plan from April 28, 2011,through the date of any judgment, excluding Defendants or any other participant that is a fiduciary to the Plan.

205.     Excluded from the Class are Defendants. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

206.     This action meets the requirements of Rule 23 and is certifiable as a class action.

207.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that many thousands of Class Members comprise the class. According to Form 5500 filed with the DOL for the Plan year ending December 31, 2015, the Class includes at least 24,000 individual current Plan participants.

208.    **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.    who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    whether Defendants were fiduciaries to the Plan under ERISA;

c.    whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.    whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.    if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

f.    what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches; and

g.    whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

209. **Typicality**: All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class Members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of its fiduciary duties to the Plan.

210. **Adequacy:** Plaintiff is an adequate representative for the Class because her interests do not conflict with the interests of the Class that she seeks to represent; she was a participant in the Plan during the Class Period; and she is committed to vigorously representing the Class. Plaintiff has retained counsel competent and highly experienced in complex class action litigation – including securities, shareholder, and other complex financial class actions – and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

211. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable and the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the

60

Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) Defendants maintain regarding the Plan. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

212.     Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**
**Inclusion of TIAA Proprietary Funds and Permitting TIAA Recordkeeping**

213.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

214.     Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

215.     Defendants were required independently to assess the prudence of each investment option for the Plan on an ongoing basis, and to act prudently and solely in the interest of the Plan's participants in deciding whether and how to maintain a recordkeeping arrangement.

216.     Defendants were also required actively to monitor and remove investments that were no longer prudent for the Plan.

217.     By allowing TIAA's bundled services and TIAA's mandated inclusion of proprietary investment options—including the CREF Stock Account, Money Market Account and

the TIAA Traditional Annuity—in the Plan, allowing TIAA to place its other proprietary investment options in the Plan, and permitting TIAA to require that it provide recordkeeping services for its proprietary products, Defendants committed the Plan to an imprudent arrangement in which certain investments were required to be included and could not be removed even if and despite that they were no longer prudent investments, and prevented the Plan from using alternative recordkeepers who could provide superior services at a lower cost.

218.    In so doing, Defendants precluded themselves from being able to fulfill their duty of loyalty to the Plan and to independently assess the prudence of each option in the Plan on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper. By allowing TIAA to dictate these terms, Defendants favored the financial interests of TIAA in receiving a steady stream of revenues from TIAA's proprietary funds over the interest of participants.

219.    As a result of Defendants' decision to include, for example, the CREF Stock Account and allow for TIAA recordkeeping services without evaluating the prudence of these options, Defendants are liable to make good to the Plan all losses resulting from its breach pursuant to 29 U.S.C. §1109(a).

220.    As described in detail above, the Plan suffered enormous losses from the inclusion of the CREF Stock Account and other overpriced, underperforming options in the Plan compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plan, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

221.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

222.    Defendants knowingly participated in the breaches of the other Defendants; knew that such acts were breaches of fiduciary duties; enabled the other Defendants to commit breaches by failing to lawfully discharge their respective fiduciary duties; knew of the breaches by the other Defendants; and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

223.    As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## COUNT II
### Prohibited Transactions—29 U.S.C. §1106(a)(1)
### Inclusion of TIAA Proprietary Funds and Permitting TIAA Recordkeeping

224.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

225.    Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *

(C) furnishing of goods, services, or facilities between the plan and party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

226.    "Party in interest" encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

227.    As a service provider to the Plan, TIAA is a party in interest. 29 U.S.C. § 1002(14)(B).

228.    By allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include Plan service providers' proprietary products, and to use TIAA as the recordkeeper for its proprietary products even when those funds were no longer prudent options for the Plan due to excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendants caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA prohibited by 29 U.S.C. § 1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of Plan assets to TIAA prohibited by 29 U.S.C. § 1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA in connection with the Plan's investments in TIAA's proprietary options that paid revenue sharing to TIAA.

229.    Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

230.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

231.    As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

### COUNT III
### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Administrative Fees

232.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

233.    Defendants were required to discharge their fiduciary duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, and were responsible for defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

234.    Under the watch of Defendants, the Plan overpaid for Plan administrative services, including recordkeeping services, due to Defendants' and Plan fiduciaries' failure to solicit bids from other service providers and recordkeepers, and in doing so Defendants fell short of fulfilling their fiduciary duties.

235.    Defendants also breached fiduciary duties by failing to monitor and control recordkeeping fees and by allowing the Plan to pay excessive revenue sharing as a result of failing

to calculate the amount the Plan was paying for revenue sharing; failing to determine whether recordkeeper fees and pricing were competitive; and failing to leverage the Plan's size to reduce fees while allowing revenue sharing to benefit third-party recordkeepers at the expense of the Plan and Class Members. Defendants' process for and failures with respect to monitoring and controlling the Plan's recordkeeping fees and these shortcomings constitute breaches of fiduciary duties.

236.    Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plan's assets grew, the asset-based revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

237.    By allowing TIAA and Vanguard to put their proprietary investments in the Plan— some of which were mandatory and cannot be removed—without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendants failed to act in the exclusive interest of participants.

238.    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries at other universities which resulted in earlier consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decision-making process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, Defendants continued to contract with two separate recordkeepers (and did so, according to Washington University, for over 30 years) until June 7, 2016. Even then, the Plan retained TIAA as the Plan recordkeeper and continues to permit TIAA to provide its services on a bundled basis with the

stipulation that imprudent proprietary products be offered as investment options in the Plan. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper, and Defendants' failure to solicit bids for a recordkeeper when the Plan underwent the June 2016 overhaul precluded the Plan from obtaining the most competitive pricing for these services, thus resulting in continued unreasonable and excessive administrative fees to the Plan.

239.    Defendants' conduct and decision-making with respect to the Plan, as alleged herein, constitutes breaches of fiduciary duties.

240.    Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged herein and are subject to other equitable or remedial relief as appropriate.

241.    Each Defendant knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own respective fiduciary duties; knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

242.    As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## COUNT IV
### Prohibited Transactions With Parties in Interest—29 U.S.C. §1106(a)(1)
### Administrative Services and Fees

243.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

244.    As service providers to the Plan, TIAA and Vanguard are parties in interest. *See* 29 U.S.C. § 1002(14)(B).

245.    By causing the Plan to use TIAA and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA and Vanguard prohibited by 29 U.S.C. § 1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA and Vanguard and in connection with the Plan's investments in funds that paid revenue sharing to TIAA and Vanguard.

246.    Under 29 U.S.C. § 1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

247.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were breaches, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. § 1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

248.    As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from

Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## COUNT V
### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Investment Management Fees, Unnecessary Marketing and Distribution (12b-1) Fees, and Mortality and Expense Risk Fees, and Performance Losses

249.   Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

250.   As Plan fiduciaries, Defendants were and are responsible for selecting prudent investment options, ensuring that those options charge reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendants had a continuing duty to evaluate and monitor Plan investments on an ongoing basis and to remove imprudent ones, regardless of how long a fund has been in the plan. Defendants' ongoing duty to monitor and remove imprudent investment options exists independently of its duties to exercise prudence in selecting investment options.

251.   Defendants' duties as Plan fiduciaries required Defendants independently to assess whether each option was a prudent choice for the Plan, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plan's menus.

252.   In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plan, the recordkeepers' financial interest in having their proprietary investment products included in the Plan, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns.

69

253.    Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

254.    Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

255.    Rather than consolidating the Plan's nearly 120 investment options into a core, limited lineup in which prudent investments were selected for a given asset class and investment style, Defendants retained numerous investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction.

256.    In addition, Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance.

257.    The Plan's investment offerings included the use of mutual funds and variable annuities with retail and/or more expensive class expense ratios far in excess of other lower-cost shares and options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager(s) and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts.

258.    All of the Plan's options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these

funds in the Plan, which Defendants failed to adequately consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants.

259.   Defendants therefore failed to discharge – and thus breached – their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

260.   Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan.

261.   Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index.

262.   Defendants also included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

263.   Defendants also included and retained the TIAA Traditional Annuity despite its punitive terms.

264.   Had Defendants engaged in a prudent investment review process, it would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

265.     Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

266.     Each Defendant knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge its own respective fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breaches of its co-fiduciary under 29 U.S.C. § 1105(a).

267.     As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## COUNT VI
### Prohibited Transactions With Parties in Interest—29 U.S.C. §1106(a)(1)
### Investment Services and Fees

268.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

269.     As the Plan's providers of investment services, TIAA and Vanguard are parties in interest. 29 U.S.C. § 1002(14)(B).

270.     By placing investment options in the Plan managed by TIAA and Vanguard in which all of the Plan's nearly $3.8 billion in assets were invested, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA and Vanguard prohibited by 29 U.S.C. § 1106(a)(1)(A); a

direct or indirect furnishing of services between the Plan and TIAA and Vanguard prohibited by 29 U.S.C. § 1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of, TIAA and Vanguard prohibited by 29 U.S.C. § 1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA and Vanguard in connection with the Plan's investments in TIAA and Vanguard investment options.

271.    Under 29 U.S.C. § 1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

272.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were constituted breaches; enabled the other Defendants to cause the Plan to engage in these transactions; and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

273.    As a result of Defendants' conduct alleged herein, Plaintiff, the Plan, and Class Members have been harmed and have sustained massive losses. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## COUNT VII
### Failure to Monitor Fiduciaries

274.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

275.    This Count alleges breach of fiduciary duties against Washington University, Lorraine Goffe-Rush, Legail Chandler, Linda Hack, the Board of Trustees, and DOES 1-10.

276.     Defendant Washington University is the named fiduciary, controlled and operated by the Board of Trustees, with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. § 1102(a). Washington University is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

277.     Upon information and belief, Defendant Legail Chandler, her predecessor Defendant Lorraine Goffe-Rush, and/or Defendant Linda Hack, and each of their predecessors, had ultimate responsibility for the decisions with respect to the Plan, and were responsible for monitoring the performance of other individuals to whom fiduciary responsibilities respecting the Plan were delegated or assigned, and for taking any necessary corrective actions, including actions necessary to ensure the fulfillment of fiduciary duties owed to the Plan and Plan participants.

278.     A monitoring fiduciary must ensure that the person to whom it delegates or assigns fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

279.     To the extent any of Washington University's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

280.     Defendants Washington University, Lorraine Goffe-Rush, Legail Chandler, Linda Hack, the Board of Trustees and DOES 1-10 breached their fiduciary monitoring duties by, among other things:

      a.    Failing to monitor representatives or agents they appointed, hired, or selected and to whom fiduciary responsibility was delegated; to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the imprudent actions and omissions with respect to the Plan alleged herein;

      b.    Failing to monitor fiduciary processes, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

      c.    Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan, including a bid for streamlined recordkeeping services under a sole recordkeeper;

d.    Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.    Failing to remove representatives or agents appointed, hired, or selected and to whom fiduciary responsibility was delegated, whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

281.    Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

282.    As a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiff, and the other Class members lost millions of dollars of retirement savings. Total Plan losses resulting from Defendants' conduct continue to increase, and will be determined after completion of discovery in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that this Court:

(a)    Determine that this action may be properly maintained as a class action, certifying Plaintiff as a class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class Counsel;

(b)    Find and declare that Defendants have breached their fiduciary duties as described above;

(c)      Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore or make whole the Plan to the position in which it would have been but for Defendants' breaches of fiduciary duty;

(d)      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

(e)      Order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

(f)      Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

(g)      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

(h)      Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

(i)      Reform the Plan to include only prudent investments;

(j)      Require Defendants and the Plan, on a routine basis, to undertake a rigorous review and analysis of all investment options offered on the Plan investment menu, and monitor and remove imprudent investment options on an ongoing basis;

(k)      To the extent a reasonable bidding process has not already been undertaken, reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses, even if this requires removal of TIAA as the recordkeeper;

(l)      Require Defendants and the Plan to evaluate the prudence of utilizing bundled services and including proprietary investment products of Plan service providers;

(m)      Remove any breaching fiduciaries as fiduciaries of the Plan and permanently enjoining them from serving as a fiduciary of the Plan;

(n)      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of the Plan's investments and/or selection of investments and reduction of expenses and wasteful investment options;

(o)      Award to the Class payment of pre-and-post-judgment interest on all damages and penalties awarded to the Plan;

(p)      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(q)      Order the payment of interest to the extent it is allowed by law; and

(r)      Grant all other equitable or remedial relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Dated: June 23, 2017                           Respectfully submitted,


By */s/ James J. Rosemergy*_____
John J. Carey MO#36918
John F. Garvey MO#35879
James J. Rosemergy MO#50166
CAREY, DANIS & LOWE
8235 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905
jcarey@careydanis.com
jgarvey@careydanis.com
jrosemergy@careydanis.com

78

Steve Schwartz (PA ID No. 50579)*
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
steveschwartz@chimicles.com

and

Robert J. Kriner, Jr. (DE ID No. 2546)*
A. Zachary Naylor (DE ID No. 4439)*
CHIMICLES & TIKELLIS LLP
222 Delaware Avenue, Suite 1100
Wilmington, DE 19801
Telephone: (302) 656-2500
Facsimile: (302) 656-9053
rjk@chimicles.com
zn@chimicles.com

* Pro hac vice motions forthcoming

Attorneys for Plaintiff